## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **CITY OF SANDY SPRINGS, GEORGIA,** | **Civil Action File No.** |
| **Plaintiff,** | _____ |
| **v.** | |
| **GRANITE RE, INC.,** | |
| **Defendant.** | |

## COMPLAINT FOR BREACH OF CONTRACT AND FOR PAYMENT ON SURETY BOND

COMES NOW, Plaintiff City of Sandy Springs, Georgia ("Plaintiff" or the "City") and files this Verified Complaint for Breach of Contract and for Payment on Surety Bond ("Complaint") against Defendant Granite Re, Inc. ("Defendant" or the "Surety") pursuant to O.C.G.A. §§ 10-7-30 and 36-91-72, showing this Court as follows:

### Parties

1.     Plaintiff City of Sandy Springs, Georgia is a municipal corporation located in Fulton County, Georgia.

2.     Upon information and belief, Defendant Granite Re, Inc. is a For Profit Insurance Corporation incorporated in the State of Oklahoma with its principal place

1

of business located at 14001 Quailbrook Drive, Oklahoma City, OK 73134. Defendant is registered to do business in the State of Georgia and may be served with a summons and copy of this Complaint through its Registered Agent: CT Corporation System, 289 S. Culver Street, Lawrenceville, GA 30046.

## **Venue and Jurisdiction**

3.     Subject matter jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeds $75,000.

4.     Personal jurisdiction is proper in this Court because the Defendant is registered to do business in the State of Georgia, regularly conducts business in the State of Georgia, and has entered into a contract with Plaintiff, a Georgia municipal corporation, the subject of which is based in the State of Georgia.

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the Defendant resides in this judicial district and a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## **Background Facts**

**A.     The Contract and Performance Bond at Issue.**

6.     On or about September 24, 2019, the City entered into that certain Contract Agreement for ITB 19-052 Brandon Mill Road Sidewalk Project TS167

(the "Contract") with A1 Contracting, LLC ("A1" or the "Principal") for the construction of a sidewalk along Brandon Mill Road in Sandy Springs, Georgia (the "Work" on the "Project" at the "Project Site").

7.     Under its terms, the Contract incorporates the Georgia Department of Transportation's Standard Specifications Construction of Transportation Systems, approved by the State Transportation Board on April 18, 2013 (the "GDOT Standard Specifications"), portions of which are attached to the Contract as Exhibit L, and the Appendix to Special Provision 670 of the GDOT Standard Specifications (the "Technical Specifications" and collectively with the GDOT Standard Specifications, the "Specifications"), which are also attached to the Contract as Exhibit L.

8.     Under Section 17.3 of the Contract, A1 was obligated to furnish separate performance and payment bonds to the City setting forth a penal sum in an amount not less than the price of the Contract. The bonds were required to incorporate the terms of the Contract therein by reference.

9.     On or about September 26, 2019, the Surety issued Performance Bond #GRGA45894 (the "Performance Bond") with A1 as its Principal and the City as its Obligee.

10.     The Surety drafted and adopted the Performance Bond.

11.    Upon information and belief, the Surety was paid a premium for the issuance of the Performance Bond.

12.    The Surety's obligation to the City is defined by the express provisions of the Performance Bond, which binds the Surety unto the City "and all persons doing work or furnishing skill, tools, machinery, supplies, or material under or for the purpose of the Contract. . . ., in the penal sum of: One Million Forty Two Thousand Five Hundred & 00/100 Dollars ($1,042,500.00)."

13.    The Performance Bond also provides that: "the conditions of this obligation are such that if the . . . Principal shall well, truly, fully and faithfully perform [the Contract] according to its terms, covenants, conditions, and agreements of said contract during the original term of said contract and any extensions thereof that may be granted by the obligee, with or without notice to the Surety, and during the life of any guaranty required under the [Contract], and shall also well and truly perform and fulfill all the undertakings, covenants, terms, conditions and agreements of any and all duly authorized modifications of said contract that may hereafter be made, then his obligation shall be void, **otherwise to remain in full force and effect**." (Emphasis added.)

14.    Pursuant to the Performance Bond, the Surety stipulated and agreed "that no change, extension of time, alterations, or additions to the terms of the

Contract or to the Work to be performed thereunder shall in any way affect its obligations on this bond, and it does hereby waive notice of any such change, extension of time, alterations, or additions to the terms of the Contract or to the work to be performed hereunder."

**B.      A1 Breaches the Contract in Several Respects.**

15.    The GDOT Standard Specifications and the Technical Specifications required A1 to design a shoring plan that was "signed and sealed by an Engineer registered in the State of Georgia" and "in accordance with OSHA Safety and Health Standards as well as state and local requirements."  (GDOT Standard Specifications, § 104.9.14; Technical Specifications, Section 02150, § 101(B)(2).)

16.    Shoring is defined as part of the "Work" to be completed under the Contract.  (GDOT Standard Specifications, § 104.1.02.)

17.    A1 was required to complete the shoring and to do so "strictly in accordance with [the] Contract."  (Contract, §§ 2.1.1, 7.2.1.)

18.    A1 warranted under the Contract that its efforts to complete the shoring would "yield only first-class results . . . and . . . be of good quality, free from faults and defects and in strict conformance with this Contract."  (*Id.* at § 7.5.1.)

19.    Per the Specifications, A1's shoring plan could not be implemented until it had been submitted to and accepted by the City through the Capital

Improvement Unit within the Department of Public Works. (Technical Specifications, §§ 1.03(A), 3.01(C).)

20.    The purpose of requiring A1 to develop and implement an engineer-approved shoring plan was, among other things, to provide proper wall bracing during excavation in order to ensure the safety of workers and pedestrians.

21.    The City had the authority at any time to order additional supports for the Project placed at the expense of A1.  (Technical Specifications, Section 02225, § 3.02(C).)

22.    The City had absolute authority under the Contract to determine the manner and method in which shoring was to proceed and to require additional shoring in its discretion as needed.

23.    Despite the Contract's clear shoring plan requirement, A1 failed and refused to submit an acceptable, site-specific shoring plan consistent with the bid documents for the Project and GDOT Standard Specifications to the City for approval for a period of eight months after the City accepted A1's initial bid for the Project, resulting in significant delay.

24.    The City provided formal notice to A1 of its failure to submit an acceptable, site-specific shoring plan consistent with the bid documents for the

Project and GDOT Standard Specifications on five separate occasions between January 15 and May 6, 2020.

25.     On or about May 6, 2020, A1 finally submitted a site-specific shoring plan consistent with the bid documents for the Project and GDOT Standard Specifications to the City, and on May 14, 2020, the City approved the plan. In connection with the approved shoring plan, the City issued a notice to proceed letter on July 6, 2020.

26.     A1, however, failed to implement the City-approved plan, forcing the City to issue verbal and written stop work orders to protect the safety of the workers and passersby at the Project Site.  The written stop work order, issued on August 20, 2020, cited nine deficiencies, including "Failing to protect utilities," "Failing to provide adequate and safe traffic control," and "Failing to install the shoring wall."

27.     On October 6, 2020, shortly after issuing the stop work order, the City issued a written notice of default (the "Notice of Default") under the Contract and informed both A1 and the Surety that it intended to make a claim on the Performance Bond.

28.     The Notice of Default identified, among other things, the following deficiencies: "Exposed Utilities must be protected"; "Adequate traffic control and flaggers must be present onsite during construction"; and "Shoring plates have not

been installed yet per approved shoring plan" (collectively, the "Work Deficiencies"). The Notice of Default further stated that because A1 had failed to engage in a diligent effort to attempt to mitigate or cure the Work Deficiencies, it had persistently failed and refused to perform its Work on the Project in accordance with the Contract and thereby had breached and defaulted on its obligations under the Contract (collectively, the "Work Default"). In accordance with the Contract, the City provided A1 and the Surety with seven days to form a plan to address the Work Deficiencies.

29.     Neither the Surety nor A1 remedied the shoring-related or other issues that the City cited in its Notice of Default within the seven-day cure period.

30.     In fact, at no point in time since September 3, 2019, when the City accepted A1's bid, did A1 actually implement the City-approved shoring plan or enter into agreements with subcontractors who could perform the work required by the approved shoring plan.

31.     Because A1 never actually implemented the shoring plan that the City approved, A1 did not comply with the requirements of the Contract and therefore A1's "Work" under the Contract was "defective." (*Id.* at § 7.5.1.)

**C.    A1 Files for Bankruptcy thereby Breaching the Contract Again.**

32.    On February 3, 2021, A1 filed a Chapter 11 bankruptcy petition (the "Bankruptcy Petition") commencing the case captioned *In re A1 Contracting, LLC*, United States Bankruptcy Court for the Northern District of Georgia, Chapter 11 Case No. 21-50943-SMS (the "Bankruptcy Case").

33.    In its bankruptcy schedules (the "Bankruptcy Schedules"), A1 indicated that it had total assets of $3,346,716.11 and total liabilities of $7,204,447.22.

34.    Both the Bankruptcy Petition and the Bankruptcy Schedules were signed by Jason Moody, CEO of A1, under penalty of perjury.

35.    Section 108.09 of the GDOT Standard Specifications, which were incorporated into and made a part of the Contract, authorized the City to declare a default under and terminate the Contract in the event A1 "becomes insolvent or is adjudicated a bankrupt, or commits any act of bankruptcy or insolvency." (GDOT Standard Specifications, § 108.09.)

36.    A1's bankruptcy filing, its inability to pay its debts as they became due, the fact that its liabilities exceeded its assets, and other evidence of insolvency provided by A1 through the Bankruptcy Case each constituted separate grounds for terminating the Contract for cause (collectively, the "Insolvency Default").

9

**D.     The City Terminates the Contract for Cause.**

37.     While numerous grounds existed for the City to terminate the Contract for cause, A1's bankruptcy filing prevented it from doing so.

38.     On June 4, 2021, the bankruptcy court entered a consent order granting the City relief from the automatic stay pursuant to 11 U.S.C. § 362(d), so that the City could terminate the Contract.

39.     The City promptly provided notice to both A1 and the Surety of its intent to terminate the Contract by letter dated June 7, 2021 (the "Notice of Intent to Terminate").

40.     In its Notice of Intent to Terminate, the City invited the Surety to propose satisfactory ways to assume the Work and to remedy the Work Default and the Insolvency Default (collectively, the "Defaults"), even though it was under no legal obligation to do so.

41.     As the Surety failed to respond in any manner to the City, the City terminated the Contract for cause by letter dated June 17, 2021 (the "Notice of Termination").

42.     In its Notice of Termination, the City gave notice to both A1 and the Surety that it was terminating the Contract for cause effective immediately pursuant to Section 12.2.2 based on A1's various Defaults.

43.    In its Notice of Termination, the City confirmed that it was exercising its authority under Section 12.2.2.1 of the Contract to "terminate the employment of [A1] and take possession of the Project Site . . . and . . . to carry out the remedies necessary to finish the Work by whatever means it may deem expedient."

44.    The City exercised its authority under Section 108.09 of the GDOT Standard Specifications, to the extent applicable, to "take over the completion of the Work; to appropriate or use any or all material and equipment on the ground that may be suitable, to enter into agreements with others for the completion of the Contract according to the terms and provisions thereof; [and] to use such other methods as may be required for the completion of the Contract."

45.    The City was entitled to terminate the Contract for cause, because A1's repeated failure and refusal to develop and submit to the City for its approval an acceptable, site-specific shoring plan consistent with the bid documents for the Project and GDOT Standard Specifications for a period of eight months constituted a persistent and repeated refusal and failure to prosecute the Work in a timely manner.

46.    The City was entitled to terminate the Contract for cause, because even after A1 finally submitted to and obtained the City's approval of a shoring plan, A1 subsequently failed and refused to properly implement the City-approved shoring

plan by, among other things, failing to install the proper wall bracing called for by the plan.

47.     The City was entitled to terminate the Contract for cause, because A1 failed to satisfy the requirements of the GDOT Standard Specifications and various Technical Specifications, which incorporate OSHA regulations, and therefore persistently disregarded regulations of public authorities having jurisdiction over the Contract.

48.     The City was entitled to terminate the Contract for cause, because A1 failed to fully perform the "Work" required under the Contract, and therefore incurred substantial violations of Sections 2.1.1, 7.2.1, and 7.5.1 of the Contract, each of which are material provisions.

49.     The City was entitled to terminate the Contract for cause due to A1's default under the GDOT Standard Specifications because A1 failed to perform the Work with sufficient workers, equipment, or materials to ensure its prompt completion.

50.     The City was entitled to terminate the Contract for cause due to A1's default under the GDOT Standard Specifications because A1 performed the Work unsuitably.

51.    The City was entitled to terminate the Contract for cause due to A1's default under the GDOT Standard Specifications because A1 neglected or refused to remove materials or remedy Work that was rejected as defective and unsuitable.

52.    The City was entitled to terminate the Contract for cause due to A1's default under the GDOT Standard Specifications because A1 failed to carry on the Work in an acceptable manner.

53.    Despite providing the Surety with ten (10) days to make a proposal, from June 7, 2021, when the City served A1 and the Surety with its Notice of Intent to Terminate, until June 17, 2021, when the City formally terminated the Contract, the City received no response from the Surety, nor did it receive any indication that the Surety intended to perform under the Performance Bond by proceeding in a satisfactory way to take over the Work and to remedy the Defaults.

**E.    The City Makes a Formal Claim on the Performance Bond.**

54.    By letter dated September 27, 2021 (as supplemented, the "Claim"), the City made demand to the Surety for payment under the Performance Bond for the cost to complete and to remediate the Work (the "Completion Costs" reflected by the "Claim Amount").

55.    By letter dated October 28, 2021, the Surety denied the City's Claim under the Performance Bond in its entirety.

56.    The City responded to the Surety's denial of the Claim by letter dated December 1, 2021 and provided the Surety with additional information and documentation.

57.    By letters dated December 13, 2021 and January 7, 2022, the Surety reasserted its denial of the City's Claim under the Performance Bond.

58.    The Surety's obligation to pay the City under the Performance Bond is excused in only one circumstance: Upon the Principal's (A1's) full and faithful performance of the Contract according to its terms, covenants, conditions, and agreements.

59.    The stated condition excusing the Surety's obligation under the Performance Bond has not been satisfied, as A1 failed to satisfy its obligations under the Contract.

60.    Accordingly, the Surety is obligated under the Performance Bond to compensate the City for its Completion Costs.

61.    The Surety has not paid the Claim Amount to the City as required under the Performance Bond.

62.     More than sixty (60) days have passed since the City made its liquidated demand to the Surety.

63.     There is now due and owing by the Surety an uncontradicted liquidated principal sum of at least $537,024.79 to which the Surety has no defense.

64.     The City has provided the Surety evidence of each element of its overall claim.

65.     The City has provided to the Surety evidence of the liquidated amount of each element of its claim.

66.     There is now due and owing by the Surety to the City an overall liquidated sum of at least $537,024.79.

67.     As of the date of this Complaint, the Surety has denied the City's demand in the Claim in its entirety.

68.     The Surety has not made any payment to the City.

## Count I:  Breach of Performance Bond

69.     The City realleges and reincorporates paragraphs 1-68 as if restated herein.

70.     The Surety has not made payment to the City in any amount.

71.     The Surety has breached the terms of the Performance Bond.

72.    The Surety has not paid the uncontradicted Claim Amount of at least $537,024.79.

73.    The Surety has denied the City's Claim in its entirety.

74.    By reason of the foregoing, the City is entitled to judgment against the Surety in the principal sum of at least $537,024.79 plus prejudgment interest running from September 27, 2021.

## Count II:  Bad Faith Denial of Bond Claim

75.    The City realleges and reincorporates paragraphs 1-74 as if restated herein.

76.    The Surety refused to perform by paying the City under the Performance Bond despite the passage of over sixty (60) days after receipt of the Claim delivered to it by the City.

77.    The Surety refused to make payment to the City despite the passage of over forty (40) days since the Surety received all requested information from the City regarding the City's Claim.

78.    The Surety's decision not to pay the Claim Amount to the City despite its inability to contest that the Claim Amount is unconditionally owed under the Performance Bond was made in bad faith.

79.     The Surety's decision not to pay anything to the City given A1's blatant failure to perform under and multiple breaches of the Contract was in bad faith.

80.     All the requirements of O.C.G.A. § 10-7-30 have been met so as to entitle the City to recover an additional twenty five percent (25%) of the Claim Amount from the Surety, plus all reasonable attorneys' fees and expenses of litigation incurred in prosecuting this case.

81.     By reason of the foregoing, the City is entitled to a judgment against the Surety for the collective principal sum of at least $537,024.79 plus twenty five percent (25%) of the Claim Amount, plus all reasonable attorneys' fees and expenses incurred in prosecuting this case.

## Count III:  Contractual Attorneys' Fees

82.     The City realleges and reincorporates paragraphs 1-81 as if restated herein.

83.     Under Section 7.13 of the Contract, A1 agreed to indemnify the City for, among other things, its attorneys' fees for certain liabilities, claims, losses, and expenses resulting from injury to or destruction of tangible property, including loss of use resulting therefrom.

84.    The City has incurred certain liabilities, claims, losses, and expenses resulting from injury to or destruction of tangible property as a result of A1's negligent acts or omissions.

85.    A1 is liable to the City for its attorneys' fees arising from certain of its liabilities, claims, losses, and expenses resulting from injury to or destruction of tangible property.

86.    Under the Performance Bond, the City is entitled to recover all attorneys' fees owed by A1 directly from the Surety.

87.    By reason of the foregoing, the City is entitled to a judgment against the Surety for its attorneys' fees to the extent attributable to any liabilities, claims, losses, and expenses resulting from injury to or destruction of tangible property.

WHEREFORE, Plaintiff City of Sandy Springs prays that:

(1)    It be granted judgment against the Surety under Count I, Count II and Count III of this Complaint;

(2)    It be awarded prejudgment interest on the unpaid balance of the Claim Amount;

(3)    All costs be cast against the Surety; and

(4)    It be granted such other and further relief as this Court deems just and

proper.

Respectfully submitted this 14th day of January, 2022.

**PARKER, HUDSON, RAINER & DOBBS LLP**

*/s/ V. Justin Arpey*
V. Justin Arpey
Georgia Bar No. 023753
Matthew M. Weiss
Georgia Bar No. 718795
303 Peachtree Street, N.E., Suite 3600
Atlanta, Georgia 30308
Telephone:  404-523-5300
Facsimile:   404-522-8409
E-mail: jarpey@phrd.com
           mweiss@phrd.com

*Counsel for Plaintiff City of Sandy Springs, Georgia*